Lawrence, J.
(orally).
This action has been brought by the plaintiff, J. C. Burke, a tax-payer of the city of Cleveland, and on behalf of said city, against the city of Cleveland, John Wagner and others. The prayer of the petition is for an injunction restraining EL D. Coffinberry, treasurer of said city, from making any further payments to said John Wagner for work done under an alleged contract with the city, and restraining J. P. Madigan, auditor of said city, from drawing warrants, and W. J. Carter, engineer *226 of said city, from certifying estimates for work done under said contract.
On February 10, 1902, one Christian F. Burkhardt entered into a contract with the city of Cleveland to construct Section 6 of the intercepting sewer along the right of way of the Lake Shore & Michigan Southern Railway Company, and extending from Doan street, in Glenville, Ohio, to a point 1,750 feet easterly therefrom, in accordance with certain plans and specifications, which provided that said sewer was to be circular in form and thirteen feet six inches in diameter, and that it should be constructed of concrete and brick masonry in open cut, the sides of said cut to be supported in a substantial and satisfactory manner with two-inch sheeting held in place by substantial check and brace timbers, all of said sheeting and bracing to be left in place and paid for at the price bid for sheeting left in place.
The contract stated that the aforesaid right of way was obtained from the Lake Shore & Michigan Southern Railway Company by an agreement incorporated in ordinance No. 23203a, passed by the city council January 9, 1899, and all the rights acquired by the city for sewer cosntruction purposes under said agreement were by said contract conferred upon the contractor and in like manner he was required to assume all the obligations, precautions and limitations required of the city in the construction of the proposed work, and it was provided that the contractor would be paid for the actual amounts of work done, and the material furnished within the limitations prescribed by specifications, on estimates in writing from the chief engineer and at the various prices bid for the same. Among the prices stipulated to be paid for such work were the following: For each cubic yard of excavation, eighty cents; for each one thousand feet board measure sheeting and bracing in trench, $14.
Section 182 of the specifications incorporated in said contract is as follows:
"The work will be done in accordance with the plans on file in the office of the chief engineer, reserving to the city the right to direct and require, by written order only, by and through the chief engineer, thereunto duly authorized, such changes, variations, additions and diminutions, in and about the work as it *227 progresses, as may, in the opinion of said engineer, become necessary by reason of any conditions or circumstances arising or discovered after the making of the contract, and rendering such changes, variations, additions, or diminutions necessary, in the opinion of said engineer, for the safety, stability, efficiency or betterment of the work; and if any such changes, variations, additions or diminutions shall be so ordered and so made, there shall be allowed or deducted on account thereof such sum or sums as, in the opinion of the chief engineer, shall be fair and reasonable, and the decision of said engineer in such case shall be final and binding upon both the city and the contractor. ’ ’
This contract was on February 27, 1902, duly assigned by Christian F. Burkhardt to the defendant, John Wagner, and such assignment was accepted by the city. No question is now made as to the validity of the original contract or as to the assignment thereof to Wagner. According to this contract the work was to be commenced within fifteen days after notice from the engineer to begin the same, and it was to be completed on or before July 1, 1902. The contractor, AYagner, got ready to enter upon the performance of his contract, but the engineer gave him no notice to begin, and in May, 1902, when spoken to on the subject by the contractor, the-engineer said that the city could not let him go on because of trouble with the railroad; the matter ran along until April 18, 1904, the engineer giving no order or permission to proceed with the work.
The contract between' the city and the railroad company, amongst other things, provided in Section 4:
“The construction of such sewers under the tracks shall be done in such manner as to permit the railway company to at all times support, maintain and use said tracks. ’ ’
Section 5 of said contract with the railroad company is as follows:
“The sides or walls of the trench excavated_ for the construction of said sewer shall be by the city thoroughly and securely protected by sheet piling and bracing so as to render and make it perfectly safe at all times for the railway company to operate its trains over and upon its tracks, at their usual rate of speed and in the usual manner, and in case it shall fail to do so, the city shall pay and indemnify said railway company against all damages resulting from such failure. ’ ’
*228 And Section 11 of said contract is as follows:
“All damages to persons or property which, may be caused by the construction or maintenance of said sewer on the right of way aforesaid shall be paid by the city.”
It seems that work had been begun on Section 7 of this sewer, being the section lying'immediately west of Section 6 and that considerable difficulty was encountered because it was found that the two-inch sheeting was entirely inadequate and that the carrying on of the work caused the tracks of the railway company to settle, resulting in a protest from the engineer of the company. There was also difficulty in connection with the property near the line of the sewer occupied by a chair factory, the proprietor threatening to enjoin the city. Finally the Lake Shore & Michigan Southern Railway Company’s engineer demanded that nine-inGh sheeting should be used instead of two-inch sheeting. This was tried for a time but the results still not being satisfactory, in 1903 an arrangement was made with the contractor for said Section No. 7 to complete the work by tunnel instead of open cut, he being allowed an additional price equal to the extra cost of using nine-inch sheeting, instead of two-inch if the work had been done in open cut. In the meantime the railroad company had laid an additional track which came within a few inches of the line of the sewer, increasing the difficulties of the situation materially and making it practically impossible to construct the sewer for Section 6, if it was to be done in open cut. In April, 1904, the board of public service entered into a subsidiary agreement with Wagner for constructing the sewer in Section 6 by tunnel work, but as this was afterwards abandoned and relinquished by both parties I do not think it important to take time to explain that matter. I come at once to speak of the second subsidiary agreement, which was entered into between the board of public service and Wagner on January 3, 1905, and is the foundation of this action.
This agreement, after reciting the conditions as they existed in connection with the construction of said Section 6 on account of the proximity to the railroad tracks and that it was desirable to change the method of construction from open cut. to tunnel work, provided that said party of the second part, that *229 is, the contractor, has agreed and by these presents does agree to. construct the remaining portion of the main intercepting sewer above- described in tunnel, the said sewer to be of the size originally contracted for, namely, thirteen feet six inches in diameter, and to be built of four rings of shale brick, all laid in Portland cement mortar and in Flemish bond where directed, the inner ring to be of No. 1 shale brick and the remaining rings of No. 1 and No. 2 shale brick. The city of Cleveland on its part agreed to pay said second party, that is, the contractor, $98,250 for the said sewer built in tunnel as herein described, complete in place, including all manholes and other appurtenances, and including cost of connecting up the work now finished at each end of the section herein mentioned, the said tunnel section being about 1640 feet in length, and not including 108 feet just easterly of Doan street already built under another contract.
It was further provided in said agreement that the specifications, except when conflicting with the conditions of this subsidiary agreement, are to be the same for the work mentioned in this subsidiary agreement and specified for the original -work under the original contract.
Immediately after the making of this second subsidiary agreement the defendant, Wagner, entered upon the work in pursuance thereof and at the commencement of this action had completed 646 feet, leaving 978 feet still to be done. The plaintiff seeks to enjoin the making of any further estimates or payments for the work done or to be done under said agreement on three grounds:
1. That the board of public service did not have the power to make such subsidiary agreement.
2. That it was not signed by all of the individual directors of the board of public service.
3. That the. price stipulated to be paid for such work was excessive, and that this was known to Mr. Springborn when he signed said agreement, and that he and the said Wagner conspired together for the purpose of giving the work to Wagner and preventing other contractors from being able to bid on said work.
Section 143 of the municipal code (Rev. Stat. 1536-679) provides that—
*230 “Whenever it becomes necessary in the opinion of the directors of the appropriate department in cities, or of the council in villages, in the prosecution of any work or improvement under contract to make alterations or modifications in such contract, such alterations or modifications shall only be made by such directors in cities or council in villages, by resolution, but such resolution shall be of no effect until the price for the work and material, or both, under the altered or modified contract, has been agreed upon in writing and signed by the contractor, and the mayor in villages, and the directors of the appropriate department in cities, on behalf of the corporation; and no contractor shall be allowed to recover anything for work or material, caused by any alteration or modification, unless such contract is made as aforesaid.”
In support of the contention that the board of-public service did not have power to make said subsidiary agreement of January 3, 1905, plaintiff’s counsel insists that the attempted modification of the contract was not a proper modification or alteration of the original contract, but was in fact a new contract upon a new subject-matter and contrary to the policy of our law that public contracts shall be let to the lowest bidder. I am not able to agree with this view however. The power is to make alterations or modifications in the contract. A contract comprises the thing to be done or furnished, and the manner of doing or furnishing the same. A modification in the contract clearly may relate to either of these and must relate to one or the other of them. The essential thing is,, that the substantial identity of the subject-matter be not thereby changed. Here the principal change was as to the manner of doing the work. The thing to be furnished was a sewer of a designated size, and this is still to be furnished. Whether the work of construction can be carried on to better advantages by means of open cut or by tunnel depends on conditions as they exist, when the work is done and may well be subject to change if made in good faith. It is further said that the power of the board to make alterations is limited to such as do not involve more than $500 in amount. It would follow from this position that there can be no modification at all when the additional cost is more than $500, for after a contract is once made the councils in cities have nothing more to do with it.
*231 Section 123 of the municipal code (Rev. Stat. 1536-618) provides: ' -
‘ ‘ The powers of council shall' be legislative only, and it shall perform no administrative duties whatever and * * * all contracts requiring the authority of - council for their execution shall be entered into and conducted to performance by the board or officers having charge of the matters to which they re-' late; and after authority to make such contract has been given and the necessary appropriations made, council shall take no further action thereon.”
It is plain, I think, from an examination of Section 143 of the code, that the limitation of $500 has reference solely to original contracts which may be entered into by the directors of public service without any action whatever by the council, and subsequent parts of the section have reference to cases where the expenditure exceeds that sum. In such cases the amount to be expended must be authorized by the council and when this is done the board has full charge of making the contract originally or any subsequent modification therein. The limitation upon the expenditure under the contract as modified is the amount authorized by the council and it is expressly provided that the price to be paid for' the work and material under the modified contract shall be agreed upon by the contractor and the directors of the appropriate department.
I am of the opinion therefore that the directors of public service under the statute had power to enter into this subsidiary agreement without any action from the council in respect thereto. The claim of the plaintiff that the subsidiary agreement of January 3, 1905, is invalid because not signed by all the members of the board is based on what strikes me to be a very narrow and technical view of the statute. It is true that it is provided that the agreement shall be signed by the contractor and directors of the appropriate department in behalf of the corporation, and it is said that this language should be strictly construed because the purpose of the statute is to protect the public interests. Undoubtedly the general purpose of the statute is to promote and protect the public interest. The purpose of the particular provision in reference to the signing of the contract would seem *232 to be for tbe purpose of authentication, and if it were not for the express provision in the subsequent part of the statute that the contractor should not be entitled to recover anything for work or material unless such contract is made as- aforesaid, the provisions in reference to the authentication of. the contract would be directory only. They are mandatory only because of the express provision that contracts made otherwise are not enforcible.
I see no reason calling for a strict construction of the language. If we consider the effect upon the contractor, depriving him of the reward for work actually done, and forfeiting his rights in respect to such work, it might be argued that the statute should receive a liberal construction. I prefer, however, to say that the statute should be reasonably construed in view of its language and in view of its object and the consequences resulting from a violation of the statute.
In Section 138 of the municipal code (Eev. Stat. 1536-674) it is provided—
“In every city there shall be a department of public service which shall be administered by three or five directors, and the number of said directors shall be fixed by ordinance or resolution of council. Such directors shall organize as a board to be known as the ‘board of public service.’ ”
In -the following sections, where the statute speaks of the powers of the board and clearly has reference to a board, the language almost always is, “the directors of public service.” For instance in 96- O. L., 66, Section 141, it is provided that the directors of public service shall have the management of all municipal water, light and heating plants, etc., and similar language is found in the following section relating to the powers conferred upon the board.
It does not mean here that the individual director shall have the management of the municipal public works. Clearly the meaning is, that the directors as a board of public service shall have that charge and that management. So that we see under 96 O. L., 67, Section 143, following a similar use of the language in each preceding section, the term “directors of the appropriate department” has reference to such officers not individually but officially and as p board.
*233 It is further provided in 96 O. L., 66, Section 138, that they, that is, the directors organized as a board of public service, shall make their own rules and all regulations for the administration of affairs under their supervision. It is stated in the answer of the defendants, other than John Wagner, that the directors of public service did adopt rules whereby contracts were to be authenticated or executed by the president of the board and the clerk. If I am correct in the view that the statute has reference to the directors in their capacity as a board, and if the execution of the contract on behalf of the city by the board is an act in that official capacity, it seems to me that the manner of execution is properly subject to the rules and regulations which they are authorized to adopt.
I next refer to the charge of conspiracy made against Mr. Springborn and Mr. Wagner, only to say that there is no testimony tending in the slighest degree to sustain such a charge and I do not understand that counsel for plaintiff now urge the same.
There remains then the question, whether the amount agreed to be paid for the work under the altered.or modified contract is so excessive as to be evidence of an abuse of discretion to such an extent as to warrant a. court of equity in setting aside the agreement, resulting not only in putting an end to the contract for the future, but in depriving Wagner of compensation for the work already done by him.
In this aspect of the case I ain of the opinion that it is immaterial as affecting the rights of Wagner, whether the officers of the city were sufficiently informed as to the cost of tunnel work or not, or whether they acted carelessly or not. If they had power to act and acted in the manner prescribed by law, if the discretion vested in them was not abused, and if Wagner was guilty of no fraud, he may deal with them at arm’s-length and is not responsible for the extent of the information possessed by them or the investigation made by them. The discretion to agree upon the price to be paid is vested in the board, subject to the limitation that the price paid under the contract as modified shall not exceed the expenditure authorized by the council, and it is elementary that in such a case official discretion will not be interfered with by the courts except on proof of fraud or of such abuse of discretion as to indicate a want of good faitb.
*234 The ground then on which an abuse of discretion must be based is the excessive price, if it be excessive, agreed to be paid by the city to Wagner for doing the work in tunnel. Evidently the same rule must apply when we consider this question based upon an excess of price as would be applied if the question related to inadequacy of price or inadequacy of consideration in any case, because the inadequacy of consideration on one side makes the excess of price on the other. Upon this subject I refer briefly to a few cases:
In the ease of Rooker v. Rooker, 29 Ohio St., 1, it is said in the syllabus:
“To defeat the title of an innocent purchaser to a note, on the ground of inadequacy of the price paid for it, the inadequacy must be such, under the circumstances, as to impeach the good faith of the purchase. ’ ’
In the case of Singree v. Welch, 32 Ohio St., 320, it is said in the syllabus:
“A release of the wife’s inchoate right of dower is a valid consideration for a conveyance of property to her.
“Such conveyance will not be held fraudulent and void as to the husband’s creditors, unless the amount of consideration received is so disproportionate to the value of the wife’s contingent dower as to be unreasonable. >
“So great is the difficulty of estimating the worth of contingent dower rights, so uncertain and imaginary are the values which are the necessary elements of the computation, that the court will not pronounce the transaction fraudulent from the fact that the wife insisted upon and received a sum greater than her dower, if the facts do not show mala fieles in her or her husband. ’ ’
In the case of Citizens Nal. Bank v. Wehrle, 18 C. C., 535, it is said in the syllabus:
“To justify an inference of fraud from the inadequacy of the price alone, the consideration must be so clearly below the market value as to strike the understanding at once with the conviction that such a sale never could have been made in good faith. ’ ’
And in the ease of Kerlin Bros. Co. v. Toledo, 20 C. C., 603, paragraph 18 of the syllabus, it is said:
*235 “There must be clear abuse of corporate power upon the part of a legislative body to authorize a court to interfere. The administration of the affairs of the city is by the law entrusted to the council and officers of the city, and the council in matters of this kind is invested with a wide discretion, and so long as it keeps within its powers, its authority is supreme and not subject to the supervision or interference of the courts. To authorize a court to interfere upon the mere ground that the price is not sufficient, the price should be so much less than would probably be obtained by again offering the property, that it might be said by all men of fair judgment that the acceptance of the bid was a reckless and improvident act.”
Let us then consider the testimony in view of the rule stated in these decisions. Perhaps the only definite testimony as to the reasonable value of constructing this sewer in tunnel work offered by the plaintiff is the testimony of Mr. Ford P. Beers, who says that in his opinion such work completed was worth only $50 per lineal foot. The price to be paid under the subsidiary agreement here in question was about $60 a foot — to be accurate, I believe $59.83. So that upon Mr. Beers’ testimony the price is excessive to the extent of $10 per lineal foot. It is quite evident, however, that Mr. Beers omitted from his estimate several items that ought to have been considered. For example he takes into account nothing for the hazards- and dangers of performing this work under the conditions imposed by the contract and under the conditions as they existed where the work was to be done, .lie apparently does not take into consideration the uncertainty of the character of the soil that may be encountered in the progress of that work, nor the cost of machinery and' appliances necessary to be provided for doing such work. lie estimates a sufficient allowance of 2% per cent, upon the cost of the machinery, allowing nothing for the wear and tear of machinery, nothing for the depreciation in value by reason of its use. Mr. Beers himself says that in performing the work of constructing the Edgewater Park sewer, which is practically all the work done in tunnel by him, the character of the soil therein varied and that the progress made depended upon the character of the soil and that sometimes they were able to make an advance of thirteen feet a day and on other days with the same equipment *236 and the same force they were not able to go more than four feet a day. «u
It is said that on one occasion prior to the time that this subsidiary agreement was entered into Mr. Beers said that he would do this work for $50 a lineal foot and would enter into a contract to do the work on those terms, and to secure his offer' he deposited a certified check for $25,000 with the city treasurer. Undoubtedly this action on the part of Mr. Beers may be regarded as a very emphatic expression of his opinion that the work could be done for $50 a foot, but it can not be considered as having any legal effect. The deposit of a certified check for $25,000 was not in pursuance of any provision of law whereby that was authorized to be done, and the terms upon which it was deposited were so indefinite that if the city undertook to specify in detail all the work, Mr. Beers might well have withdrawn his certified cheek and refused to enter into a contract or to make a bid. But suppose the city advertised for the work without any specifications other than those named by Mr. Beers when he,put in the certified cheek; if he failed to bid, the city could not appropriate that check; its remedy, if it had one, would be solely an action against Mr. Beers for damages. So that the effect of that check, so far as the city is concerned, was simply to limit the terms upon which bids would be asked and to give a very uncertain and contingent right of action to recover damages, if any damages were sustained.
In viewing the prices agreed to be paid to Wagner for this work,we can not lose sight of the conditions as they existed. We can not lose sight of the fact that there was an outstanding valid and subsisting contract between the city and Wagner for constructing a sewer in this section. This outstanding contract reserves no power to the city to terminate it at its pleasure, and the testimony shows no default on the part of Wagner which would warrant the city to terminate it upon that ground.
Then there was this contract with the railroad company whereby the city assumed not only that it would do the work without injury to the railroad company’s right of way or tracks, and without interference with the operation of its railroad, but imposing the express obligation upon the city to pay all damages *237 to person or property that might be caused by the construction of the work.
The city could have required Mr. Wagner to have put in nine-inch sheeting instead of two-inch sheeting, but, if it did so, it could not insist that he do it for the price paid for two-inch sheeting. If such a change was made, then under the provi-' sions of the contract the contractor would be entitled to receive from the city a fair and reasonable value of the increased cost and expense of putting in nine-inch sheeting instead of sheeting of the size originally specified, and it is shown here clearly that if nine-inch sheeting be used the cost of that work would be much greater that the cost under the subsidiary agreement; and it further appears from the testimony, I think, that the work done in open cut, even with nine-inch sheeting, and under any conditions that-might have been employed, would have been unsatisfactory, hazardous and dangerous. So that it is to the advantage of the city it seems to me to make the change from the construction in open cut to construction by tunnel work and that is a change which it could make only by agreement with the contractor. It is said that no written order was given by the city engineer to the contractor to put in nine-inch sheeting. That would be necessary before the actual work of putting it in could be commenced, but the city had fully determined that this work could not be done practically with two-inch sheeting, and that if done in open cut, it must be done with nine-inch sheeting.
In view of all the matters I have mentioned, the uncertainties of the cost of the work, the uncertainty as to the character of the soil that might be encountered, the conditions existing in connection with the railroad company and under the contract between the city and the railroad company, the fact that the city had this subsisting contract which it could not abrogate, looking at the cost of other work of a similar character which had been done, considering in short all the facts as they appear from the testimony and all the circumstances as they appeared to these parties at the time the subsidiary agreement was made, I am not prepared to say that this price was excessive, and much less am I prepared to say that the price was so excessive as to be evidence of fraud or bad faith.
S. Parks, F. J. Cowdry and W. J. King, for plaintiff.
N. D. Baker and Herrick & Hopkins, contra.
Having thus reviewed the several grounds upon which this contract is attacked and on which the injunction is sought, and having found against the plaintiff upon all of these grounds, the judgment of the court will be, that the petition be dismissed, and the injunction will be refused.